IN THE OREGON TAX COURT

MAGISTRATE DIVISION
Property Tax

TIMBERHILL CORPORATION,       )
                              )
              Plaintiff,      )       TC-MD 100695C
                              )
      v.                      )
                              )
BENTON COUNTY ASSESSOR,       )
                              )
              Defendant.      )       **DECISION**

Plaintiff appeals the 2009-10 real market value of property identified as Accounts 417148 and 419238. A trial was held at the Oregon Tax Court on February 14, 2012. Christopher K. Robinson, Attorney at Law, appeared on behalf of Plaintiff. Tanya Urbach (Urbach), Plaintiff's President; Eric Adams (Adams), private consultant and urban planner; Mike Peebles (Peebles), PE and civil engineer; and Richard Herman (Herman), CCIM, MAI, SRA, testified on behalf of Plaintiff. Vance Croney, Benton County Counsel, appeared on behalf of Defendant. Caleb Nelson (Nelson), certified appraiser, testified on behalf of Defendant.

The parties stipulated at trial that the 2009-10 real market value of Account 417148 is $24,000. The 2009-10 real market value of Account 419238 (subject property) is the matter before the court.

Plaintiff's Exhibits 1, 3 through 9, and 11 through 13 and Defendant's Exhibits A[1] and D and Defendant's Rebuttal Exhibit E were admitted without objection. Plaintiff's Exhibits 6 and 7 were admitted with the court noting that its review is limited to discussion of the Kings Boulevard extension. Defendant subsequently withdrew Rebuttal Exhibit E.

_____

[1] In its closing argument, Plaintiff challenged whether Defendant moved for admission of Nelson's appraisal report, Defendant's Exhibit A. Given the court's analysis, Plaintiff challenge does not bear on the outcome of this matter.

DECISION  TC-MD 100695C                                                    1

The parties presented oral closing arguments on March 7, 2012.  This matter is now ready for decision.

## I.  STATEMENT OF FACTS

The parties describe the subject property as follows:

> "The subject property primarily consists of a parcel of undeveloped land commonly referred to as the 'Timberhill' property.  It is situated in northwest Corvallis, Oregon generally north of Walnut Boulevard which is a primary east/west collector.  Established residential subdivisions adjoin to the east and west, whereas the 47 acre 'Timberhill Open Space' area adjoins to the north.  Immediately east of the subject is the 10 acre Brandis City Park facility.  The area of the parcel reflected in a survey is approximately 211.46 acres.  The tract is irregular in shape and ranges in elevation from approximately 280 feet to 480 feet above sea level (ASL) which results in a highly variable gradient differential range of roughly 5 percent to 20 percent.  Its westerly half is bisected by several significant wetland and riparian corridors.  Similarly, it is divided into northerly and southerly areas by a ravine which accommodates a natural drainageway.  A majority of the parcel is identified as having 'steeply sloped' and 'landslide' risk areas.  * * * Approximately 52.5 acres of the parcel is in forest deferral. * * * Additionally, a downsloping 2.83 acre parcel of residentially zoned land located 2,200 feet west of the primary parcel is also an element of the subject property."

(Ptf's Ex 1 at 6-7; see also Def's Ex A at 6.)

The parties agree that the subject property faces development challenges.  Adams testified that a portion of the property "is landlocked" because the residents in a neighboring subdivision, Rolling Green, have to date successfully blocked "connector streets."  Adams and Nelson acknowledge that the steep topography creates "water supply" delivery issues to the subject property.

Adams testified that he reviewed the subject property and applicable regulations, specifically the City of Corvallis Minimum Assured Development Area (MADA).[2]  He summarized his conclusions as follows:

_____

[2] Adams' memorandum dated January 18, 2012, stated:  "The term 'Minimum Assured Development Area [MADA] is defined by the City of Corvallis Land Development Code (LDC) as the '*Minimum area on a development site that is permitted to be disturbed for development, regardless of the Natural Resources or Natural Hazards Overlay designation(s) on the site*.'" (Ptf's Ex 4 at 1.) (emphasis in original.)

"The MADA analysis presented above has demonstrated that at least 88.42 acres of the 211.46-acre parcel are available for development based on the land use regulations imposed by the City of Corvallis. After accounting for those zones where Unconstrained Acreage exceeds MADA Acreage, the total net developable acreage for the parcel is 106.92 acres. While the base density range for all residentially zone[d] acreage is between 736 and 2,068 units, the land use regulation constraints, other physical limitations, and likely development costs make it unlikely that significantly more than minimum density could be achieved. Therefore, a reasonable total density range for the parcel is between 736 and approximately 850 units."

(Ptf's Ex 4 at 6.) Nelson testified that he relied on information provided to him by "John Stewart, a consultant for Timberhill Corporation," who stated that "77.12 acres of the remaining subject site are unconstrained." (Def's Ex A at 6.) Adams agreed with John Stewart's conclusion, testifying that there are 77.91 acres of "[t]otal [u]nconstrained [a]creage w/in [z]one," and acknowledged that his "MADA analysis added approximately 29 acres" to the land that can be developed. (Ptf's Ex 4 at 8.)

The parties testified about the professional or administrative office zone, referred to by the parties as P-AO. The parties agree that "no residents" are allowed in this zone. Adams and Nelson agree that the professional or administrative office parcel is not "impacted by natural resources or natural hazards," has city services to the property line and would require "NW Kings Boulevard * * * to be extended approximately 280 linear feet, along with the accompanying infrastructure." (Testimony; Def's Ex A at 41.)

The parties testified about the City of Corvallis' requirement that NW Kings Boulevard, a designated "arterial street" be extended at the time all or a portion of the subject property is developed. The parties dispute whether the Kings Boulevard extension would be "required" to be "completed" or "bonded" if the subject property was developed in phases. Defendant referenced other developments, specifically Corvallis Clinic located south of the subject property and Timberhill Meadows, stating that the "streets were developed in phases." Urbach testified

that, given her knowledge that a request to partition to the subject property resulted in the City of Corvallis denying the partition/development request unless there was a "showing that the developer could complete the NW Kings Boulevard extension" through the subject property, she does not think a "phased development" would be allowed without a bond or other type of assurance that the developer was financially able to complete the entire road extension. Adams referenced various documents, including the Corvallis Transportation Plan and the Conditions of Approval, testifying to "the conceptual plan requirement that Kings Boulevard be extended from Walnut Boulevard" and the requirement that the subject property "follow the Park and Recreation facility plan." (*See* Ptf's Exs 4 at 20; 6 at 5; 7 at 6, 11-12.) Adams acknowledged that it "is possible but not required" that the "full extension" of NW Kings Boulevard be constructed at the time part of the subject property is approved for development. (*See* Ptf's Ex 7 at 6.) The parties testified about the likelihood that Plaintiff would receive a "reimbursement" for costs incurred to extend NW Kings Boulevard. Adams testified that a "developer can request reimbursement but the city is not required to honor the request and it is subject to funds being available." (*See* Ptf's Ex 13 at 2.)

Peebles testified that the subject property is a "beautiful piece of property located on the outskirts of town [Corvallis] that is constrained by natural resources," making it a "more challenging property" to develop. Referring to the concept plan designed by John Stewart, Peebles developed a cost estimate for on-site improvements including "bridges to cross drainage," a soft cost (permit, engineering services and other fees) estimate of 25 percent and a contingency estimate of 35 percent. (Ptf's Exs 3F; 5 at 2.) Peebles testified that he divided his cost estimate between "North of Drainage" and "South of Drainage" and "Standard" and "Extraordinary" costs. (Ptf's Ex 5 at 2.) He testified that the "standard costs" to develop all of

the subject property would total close to $19 Million and "extraordinary costs" would total approximately $9 Million. (*Id.*) Peebles testified that if the City of Corvallis "approved a reimbursement cost" it would be "approximately 15 percent."

Herman testified that the subject property is a "complex property to evaluate and to appraise" and the "market at January 1, 2009, was virtually at a standstill." He testified that as of the assessment date the subject property "was not feasible to develop given the costs plus extension of Kings Boulevard." (*See* Ptf's Ex 1 at 27.) Herman concluded that the "average and median sale price of homes in Corvallis declined to $315,839 and $267,000" and

> "with the cost of development likely approximating $126,850 per homesite, it is evident that there was no way to develop the property without a significant adjustment in land cost and/or conditioning in order to mitigate cost of development. Consequently, the highest and best use of the subject property is that of a long-term speculative investment in anticipation of eventual improvement in market conditions and possible moderation on the part of the City as to inflexibility on development conditioning[.]"

(*Id*. at 29.) Nelson's appraisal report concludes that "[t]he subject property's future intended use is consistent with this zoning" and "[t]he unconstrained areas of the subject property's future intended use as Residential, Multi-family, and Professional Office are physically possible given the current zoning." (Def's Ex A at 20.) In response to questions, Nelson testified that he did not reach a definitive conclusion that the subject property's "current or proposed use is financially feasible" or that the subject property's "proposed uses of land" are "[m]aximally [p]roductive." (*Cf. Id*. at 20-21) Nelson testified that he "considered market demand."

Herman testified that relying on Adams' "Timberhill MADA Analysis," dated January 18, 2012, "the reasonably anticipated development yield of the residentially zoned area of the subject property would be 852 housing units consisting of 263 detached residences, 29 duplex/triplex units and 560 apartments." (Ptf's Ex 1 at 26.) In determining the subject

property's real market value, Herman stated that the "density equivalent of the subject multi-family component of 560 units would * * * approximate 330 detached lots" and "[t]herefore, the effective density of the subject property is approximately 622 lots (292 lots plus 330 equivalent lots)." (*Id*. at 59.) Looking at the unconstrained land and relying on the "expertise of Doug Sackinger [Sackinger], the Benton County GIS Coordinator, * * * to isolate the polygons of each designation, and determine a precise acreage," Nelson concluded that the following structures could be built: residential one to four unit structures on "35.96 acres, or 1,566,418 square feet"; "5+ unit structures" on "35.81 acres, or 1,559,884 square feet;" and a professional office on "4.05 acres, or 176,418 square feet." (Def's Ex A at 12, 14.) He testified that 135.64 acres is land constrained because it is "[p]rotected [r]iparian, [w]etland and [l]andslide [r]isk." (*Id*. at 12.)

Herman testified that after concluding that the subject property's highest and best use "as of the valuation date is that of a long-term speculative investment" his "scope of market data search focused upon market comparisons involving tracts of residentially zoned land which were not feasible to develop due to land use conditioning and/or other influences." (Ptf's Ex 1 at 52.) Herman testified that he identified five properties that he described as "Extraordinary Conditioning Residential Development Land Comparable Sale[s]." (*Id*. at 53.) He briefly testified about each of the land comparable sales, stating that the sale dates ranged from June 2005 to December 2009, and one of the properties was located in Corvallis, Oregon and the other four in Salem, Oregon. (*See Id*.) Herman testified that after adjusting for a "15 percent per year negative trend adjustment," he concluded "a $17,000 per lot unit value." (*Id*. at 58.) In his appraisal report, Herman stated that

"the effective density of the subject property is approximately 622 lots (292 lots plus 330 equivalent [detached] lots) which, when multiplied by a unit value of

$17,000 suggests and supports a value of $10,574,000. This is equivalent to $98,896 per developable acre which predictably falls at the upper extreme of the market trend adjusted range reflected by the comparables due to the favorable locational attributes of the subject and its ability to support a broad range of land uses and densities. * * * A value conclusion at the upper extreme can also be justified by the minority P-AO component which may eventually add greater land use flexibility at the time of development notwithstanding the fact that it has little influence upon highest and best use as of the value date due to market conditions. A knowledgeable purchaser will recognize and consider zoning at the time of acquisition but will most likely aggregate the zoning potential into a comprehensive land use portrait due to the potential for interceding change during the holding period."

(*Id*. at 59.) In reaching a final indicated real market value, Herman concluded an "estimated market value of the subject property as of January 1, 2009[,]" of "$2,312,000 (rounded) which is the result of subtracting the extraordinary cost burden of $8,261,862 [additional cost of extraordinary conditioning of $8,836,432 reduced by system development charge reimbursements estimated to be $574,570] from the estimated market value of the property without the extraordinary condition of $10,574,000." (*Id*.) Herman testified that if the system development charge reimbursement "is not available," the subject property's real market value would be "$1.8 Million."

Herman was questioned about the value he assigned to the portion of the subject property zoned for professional and administrative office. He responded that because he concluded the subject property's highest and best use is a "speculative long term – 10 year – hold," he did not appraise each zone but rather the "entirety, a 211 acre parcel." Nelson testified that the subject property should have been appraised "considering the potential for development considering the different types of zoning" and that development of the subject property was only constrained by "natural features." Plaintiff questioned Nelson's conclusion, referencing the Oregon Revised Statute definition of real market value and stating that as of the assessment date the subject property existed as a "211 acre parcel." After being shown Defendant's Rebuttal Exhibit E,

Herman was asked why he did not rely on or consider the Benton County bare land sales that numbered more than 30 over the three year period, 2007 through 2009. Herman was asked about each of the five properties he concluded was comparable to the subject property and why he did not consider the neighboring Timberhill Hills development comparable to the subject property.

Nelson testified that after considering the subject property's "potential for development of residential (single family), multi-family and professional office in the Timberhill area, a more marketable area of Corvallis, and the constrained area" he determined a real market value of $29,030,000, relying on the sales comparison approach. (*See also* Def's Ex A at 12.) In determining the subject property real market value, Nelson testified that he researched the sale of numerous properties before selecting 17 properties that he considered comparable to the subject property. In his appraisal report, Nelson stated that a "quantitative analysis was the first step[,]" beginning with an analysis for preliminary adjustments and determined that "none of these seventeen (17) sales required preliminary adjustments since these elements [1) real property rights conveyed, 2) financing terms, 3) conditions of sale, 4) expenditures made immediately after purchase, and 5) market conditions] were typical, and where appropriate, were similar to the subject." (*Id*. at 23.) Nelson's report stated that the next step was a qualitative adjustment analysis. (*Id*. at 24.)

Looking first at residential development of the subject property, Nelson stated that the "three Comparable Sales are undeveloped sites for future residential subdivisions." (*Id*. at 28.) Nelson briefly described the three properties, noting that his "sale one" is the same as Plaintiff's comparable sale one and his "sale three" is the same as Plaintiff's comparable sale four. To the three sale properties that Nelson identified as comparable to the subject property, Nelson made a "Time Adjustment * * * based on changes in average residential sale price changes in Corvallis

during 2006, 2007 and 2008." (*Id*.) When asked the source of the computed time adjustment, Nelson testified that he did not include his source data in his report. Using the three comparable sales, Nelson computed a $25,000 value per developable lot and $2.50 value per square foot. (*Id*.) Noting that "159 'Developable Lots' are the minimum required by zoning," Nelson determined a range of value of $3,916,044 to $3,975,000, determining an "Opinion of Residential Land Value" to be "$3,930,000." (*Id*.)

Moving next to the portion of the subject property that is zoned for professional or administrative office, Nelson testified that he identified six properties, "[a]ll * * * located in the immediate area, and hav[ing] the same zoning as the subject," as comparable to the subject property. (*Id*. at 41.) After considering size, zoning and location, Nelson's only adjustment was for date of sale to assessment date (time adjustment). Nelson was questioned about the lack of other adjustments, specifically "size and physical condition of the property." After stating in his appraisal report that he gave the "greatest weight" to "Sales 2 and 5 because they required the least adjustment, and their sale dates are closest to the effective date of value," Nelson determined a price of $27.50 per square foot for an indicated value of $4,851,495. (*Id*.) Nelson testified that "NW Kings Boulevard would need to be extended approximately 280 linear feet, along with the accompanying infrastructure. * * * The extension of NW Kings Boulevard would cost approximately $1,500 per linear foot, plus 20% soft costs is $504,000." (*Id*.) After reducing his indicated value for the estimated cost of the NW Kings Boulevard extension, Nelson determined an indicated value of $4,350,000. (*Id*.)

For the portion of the subject property that is zoned multi-family residential, Nelson identified eight comparable properties. (*Id*. at 56.) To those eight comparable properties, Nelson made adjustments for time and to some of the properties he made an adjustment for zoning or

location/access or both. (*Id.*) Nelson was asked about multi-family occupancy levels in Corvallis and whether development of the subject property for OSU students who would need public transportation to access the housing was reasonable. Adams testified that the comparable properties Nelson selected permit four to five 90 square foot bedrooms that primarily "target OSU students" who share living expenses. Nelson testified that he computed a "value per developable unit[] (133 and 444)" of $16,000 and $49,000 for an indicated value of $23,884,000. (*Id.* at 58.) He also computed a "value per square foot" of $7 and $21 or an indicated value of $27,732,467. (*Id.*) Nelson testified that he reduced each of those indicated values by the cost (estimated to be $5,046,000) to extend Kings Boulevard. (*Id.*) Nelson testified that the "indicated value via the Sales Comparison Approach * * * * * [a]s of January 1, 2009 (Rounded)" was "$20,760,000." (*Id.*) Nelson testified that he did not consider the cost to extend "NW Kings Boulevard to Lester Road," but he did estimate the cost for the portion on NW Kings Boulevard for the portion of the property that was not "constrained" in contrast to the "long term holding" portion.

In determining the subject property real market value as of the assessment date, Nelson stated:

> "The sales comparison approach is accorded the entire weight because of the high quality and relevance of the market data to the value of the subject property. * * * After considering all the factors relevant to the valuation of the vacant Residential, Multi-family, and Professional Office land located at NW Kings Boulevard and NW Century Drive, Corvallis, Oregon, it is my opinion that that the value of the subject property land as of January 1, 2009, was:
>
> *$29,030,000.*"

(*Id.* at 59.) (emphasis in original).

In response to questions, Nelson testified that he considered the city-imposed restrictions identified as MADA when he concluded the number of developable lots. In determining the

number of developable lots, Nelson testified that he relied on Adams' density analysis. Nelson was questioned about his residential lot analysis. (*Id*. at 30.) Nelson testified that even though the "number of sales of residential lots in the Timberhill area declined" from 2006 to 2008, the "price per lot did not," averaging between "$108,026 to $151,236." (*Id*.)

## II. ANALYSIS

The issue before the court is the 2009-10 real market value of Plaintiff's property. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor*, TC-MD No 020869D, WL 21263620 at *2 (Mar 26, 2003) (citing *Gangle v. Dept. of Rev*., 13 OTR 343, 345 (1995)). Real market value is defined in ORS 308.205(1),[3] which reads:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

There are three approaches of valuation (cost, income, and comparable sales) that must be considered in determining the real market value of a property even if one of the approaches is found to not be applicable. *See* ORS 308.205(2) and OAR 150-308.205-(A)(2). After concluding that the cost approach and income approach are not applicable, Plaintiff and Defendant relied on the comparable sales approach to determine the subject property's real market value.

Prior to discussing the parties' comparable sales approach to valuation, the highest and best use of the subject property must be considered. The parties agree that four factors should be considered when determining a property's highest and best use, specifically what is legally

---

[3] References to the Oregon Revised Statutes (ORS) and to the Oregon Administrative Rules (OAR) are to year 2009 unless otherwise noted.

permissible, physically possible, financially feasible, and maximally productive. Herman concluded that it is not financially feasible to develop the subject property. (Ptf's Ex 1 at 22.) In support of his conclusion, Herman discussed "physical constraints," "land use conditioning," "overall construction costs," including "entitlements in the form of an adopted Conceptual Plan which, as evidenced by the factual result of due diligence associated with the prior attempt to develop the property, is constructively of little or no contributory value due to cost of development," "homeowners association costs to maintain 72 percent of the open space in perpetuity," "minimum density requirements," "maximum lot size requirements," and "the resulting price per lot for a small lot size that will exceed what the market will likely bear." (*Id.* at 22-23.) Herman concluded that the subject property's "highest and best use as of the valuation date is therefore that of a long-term speculative investment." (*Id.* at 22.)

Looking at the same four factors, Nelson concluded after "[a] review of land sales for similarly zoned properties * * * that typical anticipated uses are for a variety of developments including Residential, Multi-family, and Professional Office." (Def's Ex A at 21.) Nelson testified that he did not reach a definitive conclusion that the subject property's "current or proposed use is financially feasible" or that the subject property's "proposed uses of land" are "maximally productive." (Def's Ex A at 20-21.)

The parties agree that the City of Corvallis approved the Timberhill Conceptual Plan with Conditions of Approval on September 18, 2000. (Ptf's Ex 7 at 2.) Approximately eight years after the Plan was adopted, the subject property remained in its natural state. Adams and Peebles testified about the challenges and potential costs associated with development of the subject property. Even though Nelson reduced his determined real market value by the "extraordinary" costs identified by Peebles, Nelson's approach assumed that a developer would develop the

property in accordance with the zone designations and achieve a real market value commensurate with comparable properties located in those zone designations. Given the enumerated constraints and length of time the Plan has been approved without development being commenced, the court concludes that it is unclear whether as of the date of assessment a developer could overcome the constraints, comply with the restrictions, and achieve financial feasibility for the subject property. The court finds Defendant's valuation approach inappropriate for the subject property as of January 1, 2009.

Even though the court accepts Plaintiff's valuation approach, the court does not agree with Plaintiff's real market value determination.

Herman did not value the subject property based solely on current zone designations even though Herman relied on zone designations to conclude an effective density of 622 lots. (Ptf's Ex 1 at 58-59.) Herman's effective density was determined using Adams' report and testimony, stating that 736 to 850 units were reasonable. Herman accepted the high end of Adams range, 852 units, and converted the 852 units into 622 lots.

Nelson divided the subject property between constrained and unconstrained land. Nelson stated that the "majority of the 135.64 acres of constrained land" suffers from "current impediments to development," leading Nelson to conclude that the "Highest and Best Use of this area of the subject" property was "Open Space." (Def's Ex A at 14.) After removing the portion of the subject property that Nelson labeled "Open Space," Nelson valued approximately 74.71 acres according to the current zoning of the subject property. In his report and testimony, Nelson determined the subject property's real market value using the comparable sales approach for the number of unconstrained acres within a particular "zoning designation." (*Cf. Id.*) Nelson stated in his report that he relied on the "expertise of Doug Sackinger [Sackinger], the Benton County

GIS Coordinator, * * * to isolate the polygons of each designation, and determine a precise acreage." (*Id.*) Sackinger did not testify nor did Nelson's report include documents to support Sackinger's determinations. After determining the "precise acreage," Nelson concluded the number of structures that could be built within each designated zone. (*Id.* at 12, 28, 38, 58.) Given the lack of supporting evidence for Nelson's acreage determination, the court accepts Plaintiff's determination that the subject property could be developed into 622 lots for residential use.

To determine a price per lot, Herman identified five properties as comparable to the subject property. (Ptf's Ex 1 at 53.) Herman determined that each of those properties was comparable to the subject property because each required "[e]xtraordinary [c]onditioning" to be developed for residential use. (*Id.*) One of the comparable properties did not state a price per lot. (*Id.*) Based on the sale and subsequent resale or "ask" of two properties, one described as "seller * * * atypically motivated and * * * buyer highly predatory," Herman concluded that the range of prices per lot should be adjusted downward 15 percent. (*Id.* at 58.) Contrary to Herman's conclusion, Defendant's evidence supports a conclusion that residential bare land sales in the Corvallis area where the subject property is located were strong through the date of the assessment. (Def's Ex A at 30.) Given Herman's reliance on one subsequent sale that based on the comment cited above resulted in a less than arm's length transaction and a second subsequent sale that was an "ask" rather than sale, the court finds Herman's evidence in support of a 15 percent downward adjustment inconclusive when compared to Defendant's evidence. The court concludes that no downward adjustment is appropriate.

Of the comparable properties selected by Herman, the price among the four for which he provided data regarding price per lot ranged from $14,727 to $25,862. (Ptf's Ex 1 at 53.) Three

of the four prices per lot clustered around $24,000 to $26,000 (rounded). (*Id*.) Of the five comparable properties selected by Herman, two were selected by Defendant for its Residential Comparable Sales Grid. (Def's Ex A at 28.) Nelson adjusted the sale price for both of those properties for time and made no other adjustments. (*Id*.) Nelson's appraisal report did not include any evidence to support his determined time adjustment. After making the time adjustment, Nelson determined a "value" per "developable lot" of $25,000. (*Id*.) Nelson's adjusted price per lot falls within Herman's unadjusted price per lot. The court concludes that a price of $25,000 per lot is reasonable.

After concluding a price per lot, Herman determined a real market value that he reduced for the "extraordinary cost burden," described as the additional cost of extraordinary conditioning of $8,836,432 reduced by system development charge reimbursements estimated to be $574,570, to develop the subject property for residential use. (Ptf's Ex 1 at 59.) Herman testified that each of the five properties he identified as comparable to the subject property required "extraordinary conditioning" to be developed for residential use. (*Id*. at 53.) No evidence was offered to show that the unadjusted price per lot of each of the comparable properties Herman identified did not take into account the buyer's estimate of all or a portion of the "extraordinary conditioning" costs required for each property to be developed for residential use. However, Nelson agreed with Herman that to develop the subject property the "extraordinary conditioning" costs estimated by Peebles would be incurred and Nelson adjusted each of his determined real market values for those costs. Given the agreement of the parties, the court accepts Herman's conclusion that the subject property's real market value should be reduced for the extraordinary conditioning costs.

/ / /

Using Herman's number of developable lots (622) and the price of $25,000 per lot determined by the court, the subject property's real market value as of the assessment date is $15,550,000 less the extraordinary conditioning costs of $8,200,000 (rounded) for an adjusted real market value of $7,350,000.

## III.  CONCLUSION

After careful consideration of the testimony and review of the evidence, the court concludes that the subject property's real market value as of January 1, 2009, was $7,350,000. Now, therefore,

IT IS THE DECISION OF THIS COURT that in accordance with the parties' verbal stipulation made at trial the 2009-10 real market value of Account 417148 is $24,000.

IT IS FURTHER DECIDED that the 2009-10 real market value of Account 419238 is $7,350,000.

Dated this ____ day of May 2012.

_____

JILL A. TANNER
PRESIDING MAGISTRATE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This document was signed by Presiding Magistrate Jill A. Tanner on May 22, 2012.  The Court filed and entered this document on May 22, 2012.*